**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

In Re: COTTON YARN ANTITRUST
LITIGATION

_____

ATLANTIC TEXTILES, on behalf of
itself and all others similarly
situated; SOUTH CAROLINA TEES,
INCORPORATED, on behalf of itself
and all others similarly situated;
LISA LESAVOY, Successor in Interest
to Apparel Sales & Printing,
Incorporated, on behalf of herself
and all others similarly situated;
ARMEN COMPANY, INCORPORATED, on
behalf of itself and all others
similarly situated; MEKFIR
INTERNATIONAL CORPORATION, on
behalf of itself and all others
similarly situated; DELL CARTIER
ASSOCIATES, INCORPORATED, on behalf
of itself and all others similarly
situated; PERFECT FIT GLOVE
COMPANY, LLC, individually and on
behalf of all others similarly
situated; RONALD LITTLE, formerly
doing business as Star Flight
Hosiery, Incorporated, on behalf of
himself and all others similarly

No. 05-2392

situated; THOMASTON MILLS,
INCORPORATED, by and through
Charles Crumley, Trustee in
Bankruptcy, on behalf of itself and
all others similarly situated,
*Plaintiffs-Appellees,*

v.

AVONDALE INCORPORATED; AVONDALE
MILLS, INCORPORATED,
*Defendants-Appellants,*

and

FRONTIER SPINNING MILLS,
INCORPORATED; PARKDALE AMERICA,
LLC; PARKDALE MILLS,
INCORPORATED; UNIFI, INCORPORATED,
*Defendants.*

In Re: COTTON YARN ANTITRUST LITIGATION

ATLANTIC TEXTILES, on behalf of itself and all others similarly situated; SOUTH CAROLINA TEES, INCORPORATED, on behalf of itself and all others similarly situated; LISA LESAVOY, Successor in Interest to Apparel Sales & Printing, Incorporated, on behalf of herself and all others similarly situated; ARMEN COMPANY, INCORPORATED, on behalf of itself and all others similarly situated; MEKFIR INTERNATIONAL CORPORATION, on behalf of itself and all others similarly situated; DELL CARTIER ASSOCIATES, INCORPORATED, on behalf of itself and all others similarly situated; PERFECT FIT GLOVE COMPANY, LLC, individually and on behalf of all others similarly situated; RONALD LITTLE, formerly doing business as Star Flight Hosiery, Incorporated, on behalf of himself and all others similarly

No. 05-2393

situated; THOMASTON MILLS, INCORPORATED, by and through Charles Crumley, Trustee in Bankruptcy, on behalf of itself and all others similarly situated,

*Plaintiffs-Appellees,*

v.

FRONTIER SPINNING MILLS, INCORPORATED,

*Defendant-Appellant,*

and

AVONDALE INCORPORATED; AVONDALE MILLS, INCORPORATED; PARKDALE AMERICA, LLC; PARKDALE MILLS, INCORPORATED; UNIFI, INCORPORATED,

*Defendants.*

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
James A. Beaty, Jr., District Judge.
(MDL-04-1622-1-JAB)

Argued: September 18, 2006

Decided: October 12, 2007

Before WILLIAMS, Chief Judge, TRAXLER, Circuit Judge, and
Thomas E. JOHNSTON, United States District Judge for the
Southern District of West Virginia, sitting by designation.

Vacated and remanded by published opinion. Judge Traxler wrote the opinion for the court, in which Chief Judge Williams concurred as to Part II and in which Judge Johnston concurred as to Parts I, II(A), and II(B)(1). Chief Judge Williams wrote an opinion dissenting from Part

I of the opinion of the court. Judge Johnston wrote an opinion dissenting from Parts II(B)(2) and II(B)(3) of the opinion of the court.

---

## COUNSEL

**ARGUED:** Shari Ross Lahlou, CROWELL & MORING, L.L.P., Washington, D.C.; Jeffrey S. Cashdan, KING & SPALDING, L.L.P., Atlanta, Georgia, for Appellants. Larry Stephen McDevitt, VAN WINKLE, BUCK, WALL, STARNES & DAVIS, P.A., Asheville, North Carolina; Steven A. Asher, WEINSTEIN, KITCHENOFF & ASHER, L.L.C., Philadelphia, Pennsylvania, for Appellees. **ON BRIEF:** Jonathan A. Berkelhammer, Jonathan P. Heyl, SMITH MOORE, L.L.P., Greensboro, North Carolina; John S. Darden, KING & SPALDING, L.L.P., Atlanta, Georgia, for Appellants Avondale Incorporated and Avondale Mills, Incorporated; James T. Williams, Jr., Jennifer K. Van Zant, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina; Kent A. Gardiner, CROWELL & MORING, L.L.P., Washington, D.C., for Appellant Frontier Spinning Mills, Incorporated. Anthony J. Bolognese, Michael E. Gehring, BOLOGNESE & ASSOCIATES, L.L.C., Philadelphia, Pennsylvania; Joseph C. Kohn, Steven M. Steingard, KOHN, SWIFT & GRAF, P.C., Philadelphia, Pennsylvania; Mindee J. Reuben, WEINSTEIN, KITCHENOFF & ASHER, L.L.C., Philadelphia, Pennsylvania; Steven A. Kanner, William H. London, Melinda J. Morales, MUCH, SHELIST, FREED, DENENBERG, AMENT & RUBENSTEIN, P.C., Chicago, Illinois; Robert C. Cone, TUGGLE, DUGGINS & MESCHAN, P.A., Greensboro, North Carolina, for Appellees.

---

## OPINION

TRAXLER, Circuit Judge:

Purchasers of cotton and poly-cotton yarn commenced a class action against various North Carolina manufacturers of the yarns, alleging that the manufacturers had engaged in a price-fixing conspiracy in violation of the Sherman Act. The manufacturers moved to dis-

miss the suit as to certain plaintiffs, arguing that those plaintiffs were bound by arbitration clauses that were broad enough to encompass the antitrust claims. The district court denied the motion. The court concluded that some of the contracts at issue did not include arbitration clauses. As to those contracts that did include binding arbitration clauses, the district court concluded that those clauses could not be enforced because they prevented the plaintiffs from effectively vindicating their statutory antitrust claims. Thus, the end result of the district court's ruling was that no plaintiff was required to submit its antitrust claims to arbitration.

The manufacturers appeal. We conclude that all contracts at issue in this appeal include a binding arbitration provision. We also conclude that the plaintiffs have failed to establish that the terms of the arbitration provisions prevent them from effectively vindicating their statutory rights. We therefore vacate the decision of the district court and remand for further proceedings.

I.

We turn first to the question of whether the contracts at issue include binding arbitration clauses. This case involves anti-trust claims asserted against Avondale Inc., and Avondale Mills, Inc. (together, "Avondale") and Frontier Spinning Mills, Inc.,[1] by a putative class of those who purchased yarn from these manufacturers between January 1, 1999, and February 11, 2004. The district court concluded that all of the Avondale contracts at issue included binding arbitration provisions, and that some of the Frontier contracts also included binding arbitration agreements. However, the district court concluded that the Frontier contracts with plaintiffs Atlantic Textiles, South Carolina Tees, and Armen Company did not include binding arbitration clauses.

Starting in 2000 and 2001, the purchasers involved in the Frontier transactions arranged purchases over the phone, discussing quantity and price. Frontier then sent written contracts (which refer to them-

---

[1]Parkdale Mills, Inc., and Parkdale America, LLC were also named as defendants. The Parkdale defendants settled with the plaintiffs before the court ruled on the arbitration issue and are no longer a part of the case.

selves as "sales contracts" and "confirmations") that confirmed the terms discussed and included additional terms, including an arbitration clause. The contracts provided that they were subject to "The Yarn Rules of 1989," J.A. 79, and stated that "[e]xcept to the extent a future transaction is governed by a signed contract between the parties, the terms and conditions hereof, including, without limitation, the arbitration provision, shall govern all further transactions." J.A. 80. The contracts were signed by Frontier, but the record contains no copy of the contracts signed by the purchasers. The contracts at issue, however, state that acceptance of the product constitutes acceptance of the contract terms.

New contracts were not sent with each shipment of yarn, because orders often contemplated multiple separate shipments, but Frontier did send invoices to the purchasers with each shipment. The invoices are not signed by either party. They do not include an arbitration provision, nor do they explicitly incorporate the terms of the sales contracts. According to an affidavit submitted by Frontier, however, the order number referenced on the face of each invoice "is the last four or five digits of the contract number." J.A. 746.

State contract law governs the question of whether the parties have agreed to arbitrate, *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *Hightower v. GMRI, Inc.*, 272 F.3d 239, 242 (4th Cir. 2001), and the parties agree that North Carolina law governs the Frontier transactions. Because the transactions involve the sale of goods, they are governed by North Carolina's version of the Uniform Commercial Code.

The district court concluded that the contracts for sale in the Frontier transactions were oral, formed over the phone when the parties talked about price, quantity, and delivery. Because arbitration was not mentioned in those conversations, the district court concluded that arbitration was not a term of the oral agreements. Applying N.C. Gen. Stat. Ann. § 25-2-207 (the UCC's "battle of the forms" provision), the district court concluded that the arbitration clauses included in the contracts and confirmations sent by Frontier did not become part of the contract because, under North Carolina law, a proposed arbitration clause is a material alteration of a contract. *See* N.C. Gen. Stat. Ann. § 25-2-207(2)(b) (2006) (stating that additional terms contained in a

confirmation of a contract between merchants become part of the contract unless the terms materially alter the contract);[2] *Frances Hosiery Mills, Inc. v. Burlington Indus., Inc.*, 204 S.E.2d 834, 842-43 (N.C. 1974) (concluding that an arbitration provision included in a contract confirmation did not become part of the contract because the arbitration requirement materially altered the contract).

On appeal, Frontier contends that arbitration of disputes is a well-established custom in the textile industry, and that, as a "usage of trade," arbitration was automatically part of the agreement reached by the parties. Frontier thus argues that because arbitration was already part of the agreement, it was not an "additional term" that could be knocked out as a material alteration under § 25-2-207(2)(b). We agree.

N.C. Gen. Stat. Ann. § 25-1-201, which sets out the UCC's general definitions, defines an agreement as "the bargain of the parties in fact, as found in their language or inferred from other circumstances, *including course of performance, course of dealing, or usage of trade* as provided in G.S. 25-1-303." N.C. Gen. Stat. Ann. § 25-1-201(b)(3) (2006) (emphasis added).[3] The authors of the definitive treatise on the Uniform Commercial Code have explained that by virtue of § 2-201,

> [t]he express agreement may be silent on a matter, yet usage of trade . . . may fill the gap. . . .
>
>          \* \* \*
>
>     The agreement of the parties includes that part of their bargain that may be found in course of dealing, usage of trade, or course of performance. These sources are relevant

---

[2]The parties agree that they are "merchants" within the meaning of the UCC.

[3]North Carolina amended portions of its UCC effective October 1, 2006, well after the proceedings below concluded. *See* 2006 N.C. Sess. Laws S.L. 2006-112 (S.B. 1555). Although the amendments changed the language of some UCC sections relevant to this case, the changes are not material to our analysis of the issues. We therefore refer to the current version of the statutes at issue.

> not only to the interpretation of express contract terms but may themselves constitute contract terms.

J. White & R. Summers, *Uniform Commercial Code* §§ 3-2, 3-3 (4th ed. 1995) (footnote omitted). Accordingly, if arbitration is a usage of trade in the textile industry, then it was included in the parties' agreement notwithstanding the fact that there was no mention of arbitration in the oral agreements. And if arbitration was already part of the agreement, the contracts and confirmations (which included an explicit arbitration clause) did not add additional terms, and § 25-2-207(2)(b) is irrelevant, at least as to the general requirement to submit any claim to arbitration. The question, then, is whether arbitration of disputes is a usage of trade in the textile industry.

"Usage of trade" is defined as "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation that it will be observed with respect to the transaction in question." N.C. Gen. Stat. Ann. § 25-1-303(c) (2006). "The existence and scope of such a usage must be proved as facts. If it is established that such a usage is embodied in a trade code or similar record, the interpretation of the record is a question of law." *Id.*

In our view, Frontier has met its burden of proving that arbitration is a usage of trade in the textile industry. The "Yarn Rules" incorporated in the Frontier sales contracts and confirmations are a collection of "industry rules regarding contract terms and conditions and industry norms" that have been gathered and reported by the American Yarn Spinners Association for more than 50 years. J.A. 541. As to arbitration, the Yarn Rules state that "[p]arties to the sale and purchase of yarns are members of the textile industry, which has, for over fifty years, settled disputes by arbitration in accordance with the terms and conditions of contracts which have tended to become standard and in accordance with equity and good conscience and the customs and practices of the trade." J.A. 542-43. Thus, the Yarn Rules themselves are strong evidence that arbitration is a usage of trade in the textile industry.

Moreover, numerous cases have noted that arbitration of disputes is standard in the textile industry. *See Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 296 (2d Cir. 1999)

("We believe that a textile buyer is generally on notice that an agreement to purchase textiles is not only likely, but almost certain, to contain a provision mandating arbitration in the event of disputes, and must object to such a provision if it seeks to avoid arbitration."); *Stedor Enters., Ltd. v. Armtex, Inc.*, 947 F.2d 727, 733 (4th Cir. 1991) ("'[I]n industries such as fabrics and textiles . . . the specialized nature of the product has led to the widespread use of arbitration clauses and knowledgeable arbitrators.'" (quoting *Pervel Indus., Inc. v. T M Wallcovering, Inc.*, 871 F.2d 7, 8 (2d Cir. 1989))); *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 846 (2d Cir. 1987) ("[T]he widespread use of arbitration clauses in the textile industry puts a contracting party . . . on notice that its agreement probably contains such a clause."); *Helen Whiting, Inc. v. Trojan Textile Corp.*, 121 N.E.2d 367, 370 (N.Y. 1954) ("[W]e can almost take judicial notice that arbitration clauses are commonly used in the textile industry . . . ."). We conclude that this evidence is sufficient to establish that arbitration is a usage of trade in the textile industry.

The purchasers submitted affidavits establishing that their corporate officers had never heard arbitration mentioned in their dealings with Frontier and that disputes were generally resolved informally. One executive stated that, to his knowledge, arbitration is not customarily used in the industry. The UCC, however, does not require that a party to a contract have actual knowledge of a usage of trade before that usage of trade is incorporated into the contract. *See* N.C. Gen. Stat. Ann. § 25-1-303(c) (defining usage of trade as "any practice or method of dealing having such regularity of observance in a place, vocation or trade *as to justify an expectation* that it will be observed with respect to the transaction in question." (emphasis added)); White & Summers, § 3-3 ("[I]t is not necessary for both parties to be consciously aware of the trade usage. It is enough if the trade usage is such as to justify an expectation of its observance."); *id.* ("[A] party can be chargeable with a usage of trade of which it is ignorant . . ."). Accordingly, the plaintiffs' affidavits are insufficient to overcome Frontier's showing.

Because Frontier sufficiently established that arbitration is a usage of trade, the oral contracts included an agreement to arbitrate notwithstanding the fact that arbitration was not mentioned in the telephone conversations. As to the general obligation to arbitrate, there is no

reason to consider whether the arbitration clauses contained in the sales contracts and confirmations would become part of the contract under N.C. Gen. Stat. Ann. § 25-2-207(2)(b).[4]

The usage of trade established by Frontier is simply that arbitration is the manner in which disputes are resolved in the textile industry, and only that general obligation became part of the contract without regard to § 25-2-207(2). The terms and conditions under which any arbitration would proceed were set forth in the sales contracts and confirmations, and those terms and conditions proceeding must be viewed as additional terms subject to analysis under § 25-2-207(2).

---

[4]Our resolution of this issue is not inconsistent with *Supak & Sons Manufacturing Co. v. Pervel Indus.*, 593 F.2d 135 (4th Cir. 1979), and *Frances Hosiery Mills, Inc. v. Burlington Industries, Inc.*, 204 S.E.2d 834 (N.C. 1974). In *Supak* and *Frances Hosiery*, the courts refused to compel arbitration after applying § 25-2-207 and concluding that the arbitration clauses materially altered the contracts. *See Supak*, 593 F.2d at 136-37; *Frances Hosiery*, 204 S.E.2d at 842-43. Our colleague suggests that *Supak* and *Frances Hosiery* established a *per se* rule that arbitration is a material alteration of a contract and that this *per se* rule prevents us from considering the facts of an individual case when determining whether an arbitration clause materially alters a contract. *Supak* and *Frances Hosiery* may well establish a *per se* rule. In our judgment, that rule governs *only* the inquiry under § 25-2-207(2)(b): whether *additional* terms contained in a confirmation will become part of a contract. Because we have concluded that the oral agreement between the parties included a obligation to submit disputes to arbitration, the arbitration clause in the confirmation is *not* an additional term and § 25-2-207(2)(b) simply does not factor into to our analysis on that point. The *Supak* rule that arbitration clauses materially alter the terms of a contract that does not otherwise include an arbitration requirement cannot somehow preclude inquiry into the threshold question of whether the contract already includes an arbitration requirement.

We also note that while *Supak* and *Frances Hosiery* both involved contracts for the sale of textiles, neither court considered whether arbitration was a usage of trade in the textile industry, and there is no indication that the issue was raised in either case. Given that usage of trade is a question of fact that must be proved by the party asserting it, the courts' silence on the usage of trade question in *Supak* and *Frances Hosiery* cannot be viewed as rejection of the contention that arbitration is a usage of trade in the textile industry.

Because the oral agreement included the obligation to submit any disputes to arbitration, we do not believe that the details of the arbitration proceeding materially altered the contract. Those additional terms therefore became part of the contract under § 25-2-207. *See* N.C. Gen. Stat. Ann. § 25-2-207(2)(b) (explaining that additional terms contained in a confirmation of a contract between merchants become part of the contract unless the terms materially alter the contract).[5]

Accordingly, we reverse the district court's conclusion that there was no binding agreement to arbitrate between the parties to the Frontier transactions.

## II.

We turn now to the broader question of whether the arbitration agreements are enforceable.

It is by now well established that the Federal Arbitration Act reflects "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). Claims asserted under federal statutes generally are arbitrable, so long as the wording of the arbitration agreement is sufficiently broad to encompass the statutory claim and Congress has not indicated its intent to prohibit arbitration of a given statutory claim. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991). As the Supreme Court has explained,

> By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. It trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration. We must assume that if Congress intended the substantive protection afforded by a given stat-

---

[5]Although the initial agreement to arbitrate disputes was (as a usage of trade) part of the oral agreement, we believe that the subsequent written confirmations setting out the terms governing such arbitration are sufficient to satisfy the Federal Arbitration Act's requirement of a written agreement to arbitrate. *See* 9 U.S.C.A. § 2.

ute to include protection against waiver of the right to a judicial forum, that intention will be deducible from text or legislative history. Having made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue.

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985) (citation omitted).

In *Mitsubishi*, the Supreme Court concluded that antitrust claims arising from international transactions are suitable for arbitration. *See id.* at 636-37. Although the Supreme Court has yet to directly consider the arbitrability of domestic antitrust claims, the Court's analysis of the question in *Mitsubishi* is equally applicable to domestic antitrust claims, as confirmed by language in subsequent cases. *See Gilmer*, 500 U.S. at 28 ("The Sherman Act, the Securities Exchange Act of 1934, RICO, and the Securities Act of 1933 all are designed to advance important public policies, but . . . claims under those statutes are appropriate for arbitration."); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 232 (1987) ("In *Mitsubishi*, . . . we recognized that arbitral tribunals are readily capable of handling the factual and legal complexities of antitrust claims, notwithstanding the absence of judicial instruction and supervision."); *id.* at 239 (explaining that "[a]lthough the holding in *Mitsubishi* was limited to the international context, much of its reasoning is equally applicable" to the question of whether domestic RICO claims may be subject to arbitration (citation omitted)); *see also Kotam Elec., Inc. v. JBL Consumer Prods.*, 93 F.3d 724, (11th Cir. 1996) (en banc) ("In light of *Mitsubishi* and its progeny . . . , we hold that . . . arbitration agreements concerning domestic antitrust claims are enforceable."). We therefore have no difficulty concluding that domestic antitrust claims, as a class, are suitable for arbitration. And as the district court concluded, the arbitration clauses at issue in this case are broad enough to encompass the plaintiffs' antitrust claims. Thus, as an initial matter, it would appear that the claims asserted by the plaintiffs should be subject to arbitration.

However, even if an arbitration clause is broad enough to encompass a statutory claim for which Congress has not precluded arbitra-

tion, arbitration of the claim will not be compelled if the prospective litigant cannot effectively vindicate his statutory rights in the arbitral forum. *See Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 90 (2000) ("[E]ven claims arising under a statute designed to further important social policies may be arbitrated because so long as the prospective litigant effectively may vindicate his or her statutory cause of action in the arbitral forum, the statute serves its functions." (internal quotation marks and alterations omitted)). The party seeking to avoid arbitration bears the burden of establishing that he cannot effectively vindicate his statutory rights under the terms of an arbitration agreement. *See Green Tree*, 531 U.S. at 92; *Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 81 (D.C. Cir. 2005). Mere speculation about how the terms of the arbitration agreement might be construed by the arbitrator or how the agreement might affect the prospective litigant is insufficient to carry that burden. *See Green Tree*, 531 U.S. at 90-91 (explaining that while "the existence of large arbitration costs could preclude a litigant . . . from effectively vindicating her federal statutory rights in the arbitral forum . . . [,] the record does not show that Randolph will bear such costs if she goes to arbitration. . . . The 'risk' that Randolph will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement.").

Although the precise language varies from contract to contract, all of the arbitration clauses at issue in this case prevent joinder — multiple plaintiffs may not join their claims against a single defendant, nor may a single plaintiff bring claims against multiple defendants in a single proceeding. The district court concluded that these provisions prevented the plaintiffs from effectively vindicating their antitrust claims, and the court therefore declined to enforce the arbitration clauses.

### A.

We first consider whether the no-joinder terms of the arbitration agreements prevent the plaintiffs from effectively vindicating their statutory rights.

The plaintiffs contend that because they allege the existence of a price-fixing conspiracy, the inability to join all defendants in a single proceeding prevents them from vindicating their statutory rights.

They claim that "[s]evering the conspiracy into separate parts would deprive Plaintiffs of the full benefit of their proof, and make the proving of the conspiracy, if not impossible, extremely difficult." Brief of Appellees at 31. Because the plaintiffs seek damages caused by the "conspiratorial actions of *all* the Defendants," the plaintiffs contend that individual arbitration proceedings would "[s]hift[ ] the focus . . . from the 'combined acts' of the Defendants to the 'individual acts' of the single Defendant before the arbitral forum" and would thereby "eviscerate" their antitrust conspiracy claims. Brief of Appellees at 32. We find this argument unpersuasive.

Contrary to the argument of the plaintiffs, we do not believe that the plaintiffs' inability under the terms of the arbitration clauses to sue both remaining defendants in a single proceeding affects their ability to prove a price-fixing conspiracy. Preliminarily, we note that the antitrust statutes themselves do not grant private plaintiffs a right to proceed against all co-conspirators in a single action; the vagaries of the relevant venue and service-of-process requirements will sometimes require the dismissal of claims against an alleged co-conspirator. *See, e.g.*, *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 495 (9th Cir. 1979) (concluding that claim against one alleged co-conspirator must be dismissed because venue was improper); *cf. Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 384 (1953) ("Congress . . . placed definite limits on venue in treble damage actions. Certainly Congress realized in so doing that many such cases would not lie in one district as to all defendants, unless venue was waived. It must, therefore, have contemplated that such proceedings might be severed and transferred or filed in separate districts originally."). Accordingly, the no-joinder terms of the arbitration agreements do not deprive the plaintiffs of any statutorily-conferred right.

Moreover, while many antitrust plaintiffs are able to proceed against all co-conspirators in a single action, the fact remains that co-conspirators are not necessary parties; a plaintiff can prove the existence of a conspiracy in an action against just one of the members of the conspiracy. *See* Fed R. Civ. P. 20; Fed. R. Civ. P. 23; *see also Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439, 463 (1945) ("In a suit to enjoin a[n anti-trust] conspiracy not all the conspirators are necessary parties defendant."); *Wilson P. Abraham Constr. Corp. v.*

*Tex. Indus., Inc.*, 604 F.2d 897, 904 n.15 (5th Cir. 1979) ("Antitrust coconspirators are jointly and severally liable for all damages caused by the conspiracy to which they were a party. A private plaintiff need not sue all coconspirators but may choose to proceed against any one or more of them." (citations omitted)). The presence of only one defendant in a given arbitration proceeding thus in no sense would *prevent* the plaintiffs from proving the existence of a conspiracy.

Moreover, it is important to note that because the Parkdale defendants have settled, only two defendants remain. Consequently, each plaintiff would be required to pursue at most two arbitration proceedings in the place of one lawsuit. And because the defendants would be jointly and severally liable, a plaintiff who finds pursuing two actions unduly burdensome could simply seek to hold one defendant liable for all damages caused by the conspiracy.[6]

The district court relied on *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690 (1962), and *Jung v. Association of American Medical Colleges*, 300 F. Supp. 2d 119 (D.D.C. 2004), in support of its conclusion that the anti-joinder provisions prevented the plaintiffs from effectively vindicating their rights under the Sherman Act. We agree with the manufacturers that these cases are inapposite. *Continental Ore* and *Jung* both involved attempts to dissect a single conspiracy claim into pieces, effectively treating the subparts of the claim as separate suits.

In *Jung*, the court rejected the defendant's attempt to compel arbitration of only one part of a larger conspiracy claim, but the court did not address the propriety of requiring a plaintiff to proceed against co-conspirators individually. *See Jung*, 300 F. Supp. 2d at 155. In this

---

[6]Although the plaintiffs do not specifically address it, we find nothing in the record that would permit us to conclude that the prohibition against joinder of *plaintiffs* provision would prevent the plaintiffs from vindicating their statutory rights. The plaintiffs did not initially seek to pursue a class action or even to file jointly their initial complaints. Instead, they filed seven separate actions, six in the Middle District of North Carolina and one in the Eastern District of North Carolina. Thus, the plaintiffs' own conduct suggests that they believed joinder of plaintiffs was unnecessary to pursue their actions successfully.

case, the defendants seek arbitration of *all* issues relating to the existence of a price-fixing conspiracy; that there must be separate arbitration proceedings for each defendant simply does not amount to an improper splitting of a single conspiracy claim. In *Continental Ore*, the court made it clear that when considering the conduct of any one defendant, the fact-finder must be able to consider not only the actions of that one defendant, but those of the entire conspiracy, looking at "the whole picture and not merely at the individual figures in it." 370 U.S. at 699 (internal quotation marks omitted). Nothing in *Continental Ore*, however, suggests that a comprehensive view of the entire conspiracy can be made only if all of the co-conspirators are parties to the action.

As noted above, co-conspirators are not necessary parties in an action against a single conspirator. There is nothing in the arbitration agreements that would prevent the plaintiffs from presenting evidence about the actions of non-party defendants in order to establish the existence of the price-fixing conspiracy alleged by the plaintiffs. Accordingly, the mere fact that the plaintiffs may not join the defendants in a single arbitration proceeding does not prevent the plaintiffs from effectively vindicating their statutory rights. While individual proceedings may be less efficient than a single proceeding, that inefficiency is a function of Congress's preference for resolution of disputes by arbitration and cannot be a basis for defeating the arbitration that Congress was seeking to encourage. *See Moses H. Cone Mem'l Hosp.*, 460 U.S. at 20 ("It is true, therefore, that if Mercury obtains an arbitration order for its dispute, the Hospital will be forced to resolve these related disputes in different forums. That misfortune, however, is not the result of any choice between the federal and state courts; it occurs because the relevant federal law *requires* piecemeal resolution when necessary to give effect to an arbitration agreement.").

We recognize, of course, that requiring each plaintiff to proceed separately against each defendant will entail additional expense. The possibility that a party to an arbitration clause will be inconvenienced and will incur some extra expense, however, does not necessarily mean that the party cannot effectively vindicate its statutory rights through arbitration. For example, we have held that the inability to bring a class action does not in and of itself render an arbitration

agreement unenforceable, *see, e.g.*, *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002); *Snowden v. Checkpoint Check Cashing*, 290 F.3d 631, 638-39 (4th Cir. 2002), but we have acknowledged that if a party could demonstrate that the prohibition on class actions likely would make arbitration prohibitively expensive, such a showing could invalidate an agreement, *see Adkins*, 303 F.3d at 502-03.

The plaintiffs in this case developed no evidentiary record below establishing how much it would cost to proceed individually against each defendant or how those increased costs would affect their ability to proceed in arbitration. The absence of an evidentiary record on this issue leaves us with mere speculation about the actual cost of individual proceedings and something little better than a wild guess about the ability of the corporate plaintiffs to bear those speculative costs. This kind of uninformed speculation about cost falls far short of satisfying the plaintiffs' burden of proving that the costs of proceeding individually against the defendants would be prohibitive and thus would prevent them from effectively vindicating their statutory rights. *See Green Tree*, 531 U.S. at 90-91; *Bradford v. Rockwell Semiconductor Sys., Inc.*, 238 F.3d 549, 558 (4th Cir. 2001) (affirming district court's decision to compel arbitration because plaintiff "has offered *no evidence* that he was unable to pay the $4,470.88 that he was billed by the AAA, or that the fee-splitting provision deterred him from pursuing his statutory claim or would have deterred others similarly situated" (emphasis added)).

The plaintiffs also suggest that when the no-joinder provisions are considered in light of the restricted discovery available in arbitration, it becomes apparent that the prohibition against joinder prevents them from effectively vindicating their statutory rights. The plaintiffs argue that no third-party discovery would be available in arbitration. Given the importance of discovery to establishing an antitrust claim, *see, e.g.*, *In re Uranium Antitrust Litig.*, 480 F. Supp. 1138, 1155 (N.D. Ill. 1979) ("[T]he heart of any American antitrust case is the discovery of business documents. Without them, there is virtually no case." (internal quotation marks omitted)), the plaintiffs contend that the limited discovery available in arbitration would prevent them from proving their antitrust claims. We disagree.

While discovery generally is more limited in arbitration than in litigation, that fact is simply one aspect of the trade-off between the

"procedures and opportunity for review of the courtroom [and] the simplicity, informality, and expedition of arbitration" that is inherent in every agreement to arbitrate. *Mitsubishi*, 473 U.S. at 628. Because limited discovery is a consequence of perhaps every agreement to arbitrate, it cannot, standing alone, be a reason to invalidate an arbitration agreement. And while the plaintiffs contend that antitrust claims are uniquely dependent on the ability to engage in wide-ranging discovery, the Supreme Court has at least implicitly rejected the argument that discovery limitations render antitrust claims unsuitable for arbitration. *See Gilmer*, 500 U.S. at 31 ("Gilmer also complains that the discovery allowed in arbitration is more limited than in the federal courts, which he contends will make it difficult to prove discrimination. It is unlikely, however, that age discrimination claims require more extensive discovery than other claims that we have found to be arbitrable, such as RICO and antitrust claims.").

Even if there could be a particular case where the restricted discovery available in arbitration would effectively prevent a plaintiff from proving his antitrust claim, the plaintiffs have fallen far short of establishing that this is such a case. The plaintiffs do not contend that they would be unable to obtain adequate discovery from the defendant manufacturer in each of the separate arbitration proceedings, and they do not identify any other entity that might have discoverable information.[7] Thus, even in separate arbitration proceedings, the plaintiffs will be able to obtain discovery from each of the defendants. Because the plaintiffs have identified no arbitration rule that would prevent them from introducing in a proceeding against one manufacturer information obtained from another manufacturer, the plaintiffs simply have not established that they will be handicapped by the level of discovery available in arbitration to such an extent that they would be unable to prove their claims.

---

[7]We also note the possibility that discovery could be compelled by the district court. *See COMSAT Corp. v. Nat'l Sci. Found.*, 190 F.3d 269, 276 (4th Cir. 1999) (noting that while arbitrators generally lack the ability to compel third parties to provide pre-trial discovery materials, we have nonetheless "contemplated that a party might, under unusual circumstances, petition the district court to compel pre-arbitration discovery upon a showing of special need or hardship").

As noted above, the plaintiffs bear the burden of showing that the terms of the arbitration agreement would preclude them from effectively vindicating their statutory rights. *See Green Tree*, 531 U.S. at 92. This burden is a substantial one and cannot be satisfied by a mere listing of ways that the arbitration proceeding will differ from a court proceeding, or by speculation about difficulties that *might* arise in arbitration. *See id.*; *cf. Microstrategy, Inc. v. Lauricia*, 268 F.3d 244, 251-52 (4th Cir. 2001) ("[T]he party opposing arbitration bears a heavy burden of proving waiver. . . . [T]hat proof must be concrete, not merely speculative." (internal quotation marks omitted). The plaintiffs' arguments about the discovery limitations attendant to arbitration proceedings fall well short of satisfying their burden. Accordingly, we conclude that the plaintiffs have failed to establish that the no-joinder provision of the arbitration agreements prevents them from effectively vindicating their statutory rights. The district court therefore erred when concluding that the restriction against joinder of parties rendered the arbitration agreements unenforceable.

## B.

We now consider the issue of the contractually-established limitations period. The Clayton Act, 15 U.S.C.A. § 15b (West 1997), establishes a four-year limitations period in which to bring a claim for a violation of the Sherman Act, 15 U.S.C.A. § 1 (West 1997). The arbitration agreements, however, establish a one-year period in which claims must be brought. The plaintiffs contend that the shortened limitations period renders the arbitration agreements unenforceable.[8]

---

[8]We note that South Carolina law prohibits contractual shortening of statutes of limitation. *See* S.C. Code Ann. § 15-3-140 (West 2005). If the South Carolina statute applies to the contracts that are subject to South Carolina law, a question that we need not and do not decide here, then the shortened limitation period could not be applied to the South Carolina plaintiffs and thus would not impair their ability to vindicate their statutory rights. But because North Carolina has no similar prohibition against contractual shortening of statutory limitation periods, we must still consider the enforceability of the one-year limitation period contained in the arbitration agreements.

1.

As a general rule, statutory limitations periods may be shortened by agreement, so long as the limitations period is not unreasonably short. *See Missouri, Kan., & Tex. Ry. Co. v. Harriman Bros.*, 227 U.S. 657, 672 (1913); *Atlantic Coast Line R. Co. v. Pope*, 119 F.2d 39, 44 (4th Cir. 1941). There is no language in the Clayton Act that would prevent parties from agreeing contractually to a shortened limitations provision. *See* 15 U.S.C.A. § 15b; *cf. Stephan v. Goldinger*, 325 F.3d 874, 876-77 (7th Cir. 2003) (concluding that statutory limitations period established by the Commodity Exchange Act could be contractually shortened, noting that language of statute did not preclude shortening). The question, then, is whether the one-year period is reasonable.

Courts have frequently found contractual limitations periods of one year (or less) to be reasonable. *See, e.g., Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352, 357-59 (6th Cir. 2004) (finding a 6-month limitation period to be reasonable in a case raising claims under 42 U.S.C.A. § 1981); *Northlake Reg'l Med. Ctr. v. Waffle House Sys. Employee Benefit Plan*, 160 F.3d 1301, 1303-04 (11th Cir. 1998) (finding reasonable a 90-day limitations term contained in an ERISA-governed employee benefits plan); *see also Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 673 n.16 (6th Cir. 2003) (en banc) (enforcing one-year limitations provision contained in arbitration agreement). Moreover, North Carolina has by statute deemed one-year limitations periods reasonable in contracts, like the ones at issue here, that are subject to the Uniform Commercial Code. *See* N.C. Gen. Stat. Ann. § 25-2-725(1) (2006) (permitting parties to contracts subject to the UCC to shorten a statute of limitations to not less than one year). Because we are considering the shortening of a federal statute of limitations, the North Carolina statute is not determinative of the issue. Nonetheless, that the contractual limitations period is *per se* reasonable under the state law that governs the contract formation provides strong support for the reasonableness of the contractual limitations period.

The plaintiffs contend that the one-year period is "patently unreasonable," Brief of Appellees at 45, because it is a drastic reduction from the otherwise applicable four-year statutory limitations period.

According to the plaintiffs, there is an "increased chance" that their complaint might be found to have been filed outside the limitations period and that the shortened limitations period "*could have* the effect of greatly reducing the amount of recoverable damages." Brief of Appellees at 44 (emphasis added).

The plaintiffs' arguments amount to little more than an observation that the limitations period under the arbitration agreements is shorter than that provided by federal law and the unremarkable recognition that limitations provisions affect the amount of damages that may be recovered. These same arguments, of course, could be made every time a contract establishes a shorter limitations period than that of an otherwise applicable statute. Given the established rule that statutory limitations periods can be contractually shortened, so long as the contractual period is not unreasonably short, the plaintiffs' remarking-on-the-obvious cannot suffice to carry their burden of establishing that the contractual limitations period is unreasonable.

Antitrust is a complex area of the law, and antitrust trials (or arbitration proceedings) can be long and involved. There is no basis in the record, however, for us to conclude that the same difficulty and complexity also attends to the plaintiff's initial determination to pursue an antitrust claim, so as to make a one-year limitations period unreasonably short. Accordingly, we conclude that one-year limitations period established in the arbitration agreements is reasonable.

2.

Our conclusion that the contractual limitations period is reasonable, however, does not fully resolve the plaintiffs' challenges to the arbitration agreements. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." *Mitsubishi*, 473 U.S. at 628. Thus, we must consider whether the contractual limitations period is inconsistent with any substantive rights conferred under the antitrust laws. If it is, then the contractual limitations period would not be enforceable. *See, e.g.*, *Kristian v. Comcast Corp.*, 446 F.3d 25, 48 (1st Cir. 2006) (in case involving arbitration of antitrust claims, concluding that arbitration agreement's ban on treble damages was unenforceable, because right to recover

treble damages is a substantive right); *Robert Half Int'l*, 413 F.3d at 83 (concluding that arbitration agreement's ban on punitive damages was not enforceable because civil rights statute under which the plaintiff was proceeding provided for punitive damages); *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 & n.14 (5th Cir. 2003) (concluding that arbitration agreement's ban on punitive damages was not enforceable as to the plaintiff's Title VII claim); *Morrison*, 317 F.3d at 673 (concluding that arbitration agreement's restriction on the damages recoverable was not enforceable because it was inconsistent with the damages authorized by Title VII).

Section 15b was added to the antitrust statutes in 1955, more than forty years after "the original substantive liabilities were established." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 558 n.29 (1974), and we have found only two cases where courts have considered whether § 15b is substantive or procedural. In *Kristian v. Comcast Corp.*, the First Circuit concluded that an antitrust plaintiff's challenge to the one-year limitations period included in the arbitration agreement must be submitted to the arbitrator and did not prevent the court from compelling arbitration. In the course of its discussion, however, the court described the limitations issue as a procedural one. *See Kristian*, 446 F.3d at 43. And the Eighth Circuit, in a case decided not long after § 15b was enacted (but which did not involve questions of arbitration), likewise viewed the limitations period as procedural rather than substantive. *See Kansas City, Mo. v. Federal Pac. Elec. Co.*, 310 F.2d 271, 282-83 (8th Cir. 1962).

We also believe that § 15b should not be viewed as establishing substantive rights.[9] As noted above, there was no federal limitations

---

[9]While the legislative history is not determinative of the question, we note that when § 15b was enacted, at least some members of Congress viewed it as purely procedural in nature, not substantive. *See American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 558 n.29 (1974) ("During debate a member of the House Judiciary Committee reporting the bill was asked, '[A]m I correct in assuming that this limitation provided by this amendment is strictly a procedural limitation and has nothing to do with substance?' to which he replied: 'It was the specific purpose of the committee in reporting this bill to in no way affect the substantive rights of individual litigants. It is simply a procedural change and suggested with the thought of setting up a uniform statute of limitations. That is the sole purpose.'" (quoting 101 Cong. Rec. 5131 (1955) (remarks of Reps. Murray and Quigley))).

period during the early life of the Sherman Act. Until § 15b was enacted in 1955, private antitrust actions were governed by the most analogous *state* statute of limitations. *See, e.g.*, *id.* at 282; *Moviecolor Ltd. v. Eastman Kodak Co.*, 288 F.2d 80, 82 (2d Cir. 1961). If Congress was content for so long to permit antitrust plaintiffs to be subject to different limitations periods (which of course affected the amount of damages that could be recovered), it seems difficult to conclude that Congress, by merely establishing a uniform limitations period, intended to vest plaintiffs in all antitrust cases with a substantive and non-waivable right to wait four years before bringing suit and to recover a full four years' worth of damages.

Accordingly, we conclude that § 15b does not establish substantive rights. A contractual modification of the otherwise applicable limitations therefore is not foreclosed by the Supreme Court's admonition that arbitration agreements may not dispossess plaintiffs of the substantive rights established by the statute under which their claims arose.

3.

While statutory claims are arbitrable unless Congress has specifically provided otherwise, agreements to arbitrate statutory claims may nonetheless be unenforceable if the terms of the agreement prevent the plaintiff from effectively vindicating his statutory rights. *See Green Tree*, 531 U.S. at 90; *Mitsubishi*, 473 U.S. at 636-37. Accordingly, we must now determine whether the one-year limitations period, though generally reasonable, could somehow prevent the plaintiffs from effectively vindicating their statutory rights. The plaintiffs' arguments on this point are the same as those urged in support of their view that the limitations period is unreasonable. They contend that their antitrust claims might be found to be untimely filed under a one-year limitations period and that the one-year period could substantially reduce the amount of damages recoverable.

Implicit in the plaintiffs' argument about the amount of damages recoverable is the view that a plaintiff's rights under the antitrust laws are vindicated *only* if the plaintiff can recover damages for the full four-year period permitted under the Clayton Act. We disagree. We have explained that the "crucial inquiry" when considering a claim

that an arbitration agreement prevents a plaintiff from vindicating his statutory rights "is whether the particular claimant has an adequate and accessible substitute forum in which to resolve his statutory rights." *Bradford*, 238 F.3d at 556. Given our conclusion that the Clayton Act's four-year limitation period does not create substantive, non-waivable rights for antitrust plaintiffs, we cannot conclude that the arbitral forum is inadequate or inaccessible merely because the plaintiff may recover a lesser quantum of damages than he might have in a judicial forum.

Also implicit in the plaintiffs' arguments and the decision of the district court is the assumption that if the plaintiffs' claims are untimely under the terms of the arbitration agreements, then the plaintiffs necessarily cannot effectively vindicate their statutory rights in the arbitral forum. As noted above, the relevant question is whether the arbitration agreement provides the plaintiff with an "adequate and accessible substitute forum." *Id.* We have recognized the possibility that very high arbitration costs could render the arbitral forum inaccessible to a given plaintiff, *see, e.g.*, *Adkins*, 303 F.3d at 502-03; *Bradford*, 238 F.3d at 556, but it seems quite a different matter to allow a plaintiff's failure to commence an action within the reasonable contractually-established limitations period to render an otherwise adequate and appropriate arbitral forum suddenly inadequate or inaccessible. *Cf. In re Vial*, 115 F.3d 1192, 1194 n.5 (4th Cir. 1997) (en banc) (explaining that while a federal prisoner may file a petition seeking relief under 28 U.S.C.A. § 2241 if § 2255 is inadequate or ineffective, § 2255 is not inadequate simply because the prisoner is procedurally barred from obtaining relief under § 2255). To do so would be to give plaintiffs a back-door escape from the effects of their agreement to arbitrate and would be inconsistent with the strong federal policy favoring arbitration. *See Moses H. Cone*, 460 U.S. at 24 (explaining that the Federal Arbitration Act reflects "a liberal federal policy favoring arbitration agreements"). We need not, however, resolve this question at this point in the proceedings, because, as we will explain below, the plaintiffs have failed to establish that their claims are untimely under the one-year limitations provisions set forth in the arbitration agreements.

Generally speaking, an antitrust claim arises and the statute of limitations "begins to run when a defendant commits an act that injures

a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). "In the context of a continuing conspiracy to violate the antitrust laws, . . . this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Id.* Thus, in cases like this one involving allegations of "a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g.*, each sale to the plaintiff, starts the statutory period running again." *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (internal quotation marks omitted).

The complaint that consolidated the various individual actions brought by the plaintiffs was filed in January 2005, but the district court's docket reveals that the individual complaints were filed in March, April, May, and August of 2004. Under *Klehr*, then, the plaintiffs' claims would be timely even under a one-year limitations period so long as the plaintiffs made a purchase from the Defendants within a year before the complaints were filed. For the plaintiffs to carry their burden of showing that the terms of the arbitration agreement would prevent them from effectively vindicating their statutory rights, they should at least demonstrate that they made no purchases in the year before the complaints were filed. The plaintiffs, however, have made no effort to make such a showing. There is no factual record to support their assertion that their claims might be time-barred, or even an explanation of why they believe their claims might be barred. Moreover, the record contains evidence of sales taking place as late as November 2003 and January 2004, well within a year before the complaints were filed. Thus, at least as to some of the plaintiffs, there is evidence affirmatively demonstrating that a one-year statute of limitations would not prevent them from proceeding on their antitrust claims.

The plaintiffs' contention that a one-year limitations period would prevent them from proceeding on their antitrust claims also fails to account for the doctrine of fraudulent concealment, which is read into *all* federal statutes of limitations, including § 15b, *see Holmberg v.*

*Armbrecht*, 327 U.S. 392, 397 (1946); *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995).

> The purpose of the fraudulent concealment tolling doctrine is to prevent a defendant from concealing a fraud, or committing a fraud in a manner that it concealed itself until the defendant could plead the statute of limitations to protect it. Thus, pursuant to this doctrine, when the fraud has been concealed or is of such a character as to conceal itself, and the plaintiff is not negligent or guilty of laches, the limitations period does not begin to run until the plaintiff discovers the fraud.

*Meadow Gold Dairies*, 71 F.3d at 122 (citation, internal quotation marks and alteration omitted).

The plaintiffs' complaint alleges that the Defendants fraudulently concealed their anti-competitive activities until February 11, 2004, when a shareholder in Parkdale (the manufacturer that settled before this appeal was filed) announced that Parkdale had participated in activities with competitors that may have violated antitrust laws. As noted above, the class action complaint was filed in January 2005 and the individual complaints were filed in 2004. If the fraudulent concealment doctrine applies to the contractually-established limitations period,[10] the plaintiffs' claim would appear to be timely filed.

We need not and do not decide whether the doctrine of fraudulent concealment applies in this case. The arbitration agreements provide that "[a]ll issues relating to Statute of Limitations barring or preventing the commencement of proceedings are not arbitrable and shall be determined by the Court and not the arbitrators." J.A. 202.[11] Questions

---

[10]*See Stephan v. Goldinger*, 325 F.3d 874, 877 (7th Cir. 2003) (concluding that "[o]ne year . . . is not an unreasonably short time for bringing a suit, at least given tolling doctrines that we assume . . . would be read into a contractual limitations period just as they are into a statutory one, unless negatived by clear language" (citations omitted)).

[11]The quoted language comes from a Frontier arbitration agreement. The relevant language in the Avondale contracts is largely identical. *See* J.A. 268.

about the timeliness of the action and the applicability of the doctrine of fraudulent concealment will thus be determined by the district court on remand. For purposes of our decision now, it suffices to say that because it is far from certain that the one-year limitations period will have any effect on the plaintiffs' ability to prosecute their antitrust claims, the plaintiffs have not carried their burden of demonstrating that the terms of the arbitration agreement will prevent them from effectively vindicating their statutory rights. *See PacifiCare Health Sys., Inc. v. Book*, 538 U.S. 401, 406-07 (2003) (refusing to invalidate arbitration agreement that precluded award of punitive damages, which plaintiff contended was inconsistent with the treble damages authorized by the RICO statute, because it was unclear whether the arbitrator would interpret the arbitration to preclude an award of treble damages); *Morrison*, 317 F.3d at 673 n.16 (enforcing one-year limitations provision of arbitration agreement because the plaintiff "failed to show that the one-year limitations period in the agreement unduly burdened her or would unduly burden any other claimant wishing to assert claims arising from their employment").

On remand, the district court, after consideration of the principles discussed above, must determine whether the plaintiffs' claims were timely filed. If the district court concludes that the claims were timely, the court should stay the actions and order the plaintiffs to proceed in arbitration. If the district court concludes that the claims were not timely, the court must then determine, in light of the concerns that we have identified above, *see supra* at page 25, whether that fact renders the contractual limitations period unenforceable. Finally, if the district court concludes that the one-year limitations period bars the plaintiffs' claims and is unenforceable, the district court must then consider whether severance of the limitations provisions, rather than invalidation of the arbitration agreements, would be the appropriate remedy. *See, e.g.*, *Terminix Int'l Co. v. Palmer Ranch Ltd. P'ship*, 432 F.3d 1327, 1331 (11th Cir. 2005) ("If all the provisions of the arbitration clause are enforceable, then the court must compel arbitration according to the terms of the agreement. If, however, some or all of its provisions are not enforceable, then the court must determine whether the unenforceable provisions are severable."); *see also Kristian*, 446 F.3d at 64 (concluding that various provisions in an arbitration agreement would prevent antitrust claimants from effectively vindicating their statutory rights, but severing the

offending provisions and compelling arbitration); *Hadnot*, 344 F.3d at 478 (severing unenforceable restriction on punitive damages and ordering parties to proceed to arbitration); *Spinetti v. Service Corp. Int'l*, 324 F.3d 212, 219-23 (3d Cir. 2003) (concluding that arbitration agreement provisions regarding attorney's fees and the payment of the costs of arbitration were unenforceable, but severing those terms and requiring the parties to proceed to arbitration); *Gannon v. Circuit City Stores, Inc.*, 262 F.3d 677, 683 (8th Cir. 2001) (severing unenforceable ban on the recovery of punitive damages from the arbitration agreement and compelling arbitration).

### III.

To summarize, we conclude that arbitration is a usage of the trade in the textile industry and that an agreement to arbitrate therefore became a term of the Frontier contracts without the need for analysis of the battle of the forms under N.C. Gen. Stat. Ann. § 25-2-207. We conclude that the terms of the arbitration agreements prohibiting joinder of plaintiffs or defendants do not prevent the plaintiffs from effectively vindicating their statutory rights. And while the requirement of proceeding separately perhaps in some case could be prohibitively expensive, the plaintiffs in this case have failed to carry their burden of demonstrating that the costs of separate arbitration proceedings would be so high that they could not proceed with their claims. We also conclude that the Clayton Act's four-year limitations period is not a substantive portion of the federal antitrust laws and that the federal limitations period may be shortened by contract. The one-year limitation period established in the arbitration agreements is not unreasonably short, and the plaintiffs have failed to demonstrate that the one-year limitation period will prevent them from pursuing their antitrust claims. Accordingly, we hereby vacate the district court's judgment and we remand to the district court for further proceedings consistent with this opinion.[12]

*VACATED AND REMANDED*

---

[12]In addition to seeking to compel arbitration, the manufacturers also requested a stay pending arbitration of the claims of two plaintiffs with

WILLIAMS, Chief Judge, concurring in part and dissenting in part:

I fully concur in Part II of the majority opinion (the section addressing the enforceabilty of the arbitration clauses). I respectfully disagree, however, with the analysis and conclusion in Part I (the section addressing whether all of the parties to the Frontier transactions have contracts containing binding arbitration agreements). I have two primary points of contention in this regard. First, I believe that this case is indistinguishable from *Supak & Sons Mfg. Co. v. Pervel Indus.*, 593 F.2d 135 (4th Cir. 1979). Second, I do not believe that it is possible to distinguish *Supak* by applying N.C. Gen. Stat. Ann. § 25-2-207 (2005) (North Carolina's version of U.C.C. § 2-207) to each individual term of the arbitration clauses at issue, rather than addressing the arbitration clause as a whole.

## I.

The district court, applying § 25-2-207, found that the arbitration clauses contained in the written confirmations sent by Frontier did not become part of the contracts between Frontier and those plaintiffs that did not sign and return the confirmation forms. This finding reflected the district court's belief that the North Carolina Supreme Court's decision in *Frances Hosiery Mills, Inc. v. Burlington Indust., Inc.*, 204 S.E.2d 834, 842 (N.C. 1974), and our decision in *Supak* were controlling. Because the case before us is indistinguishable from *Frances Hosiery* and *Supak*, I believe the district court did not err in following our precedent.

---

whom the manufacturers had no dealings during the period alleged in the class action. Given its conclusion that arbitration was not required, the district court did not consider the motion to stay. On appeal, the manufacturers contend that the district court erred by denying the motion. We decline to consider the argument at this juncture. A decision to stay related claims pending arbitration is a matter entrusted to the discretion of the district court. *See Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983) ("In some cases . . . it may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket."). The district court on remand should reconsider whether a stay is warranted.

*Frances Hosiery* and *Supak* established binding precedent governing the construction of § 25-2-207 in the context of contractual arrangements virtually identical to those at issue in this case. In *Frances Hosiery*, the parties formed an oral contract for the sale of yarn, and when the seller shipped yarn to the buyer, it included invoices purporting to be "contracts" and containing arbitration clauses. 204 S.E.2d at 836-37, 841. The North Carolina Supreme Court determined that the invoices were confirmations within the meaning of § 25-2-207 and ultimately held that the arbitration clause constituted a proposed additional term that materially altered the contract. *Id.* at 842-43. In *Supak*, we applied the holding of *Frances Hosiery* to an oral contract for the sale of fabric followed by a written confirmation containing an arbitration clause. 593 F.2d at 136. In so doing, we explained that *Frances Hosiery* established a rule that "the addition of an arbitration clause constitutes a *per se* material alteration of the contract," and as a result, the arbitration clause in the confirmation form did not become part of the parties' contract. *Id.* at 136.1*

---

*In *Supak & Sons Mfg. Co. v. Pervel Indus.*, 593 F.2d 135 (4th Cir. 1979), we also rejected the argument that *Frances Hosiery*'s *per se* rule was preempted by the Federal Arbitration Act (FAA) because it served to restrict the validity and enforceability of arbitration agreements. *See id.* at 137 (stating that "U.C.C. § 2-207, as judicially construed in . . . North Carolina" does not "restrict the validity or enforceability of arbitration agreements,[ ] but is rather a general rule of contract formation") (footnote omitted). Frontier argues that *Supak* was wrongly decided in this regard and was impliedly overruled by *Saturn Distrib. Corp. v. Williams*, 905 F.2d 719 (4th Cir. 1990). *Saturn Distrib. Corp.*'s recognition that the Federal Arbitration Act (FAA) "preempt[s] state rules of contract formation which single out arbitration clauses and unreasonably burden the ability to form arbitration agreements," *id.* at 723, does not call the into question Supak's validity, as *Supak* also acknowledged that the FAA "is preemptive of conflicting state laws which restrict the validity or enforceability of arbitration agreements," *Supak*, 593 F.2d at 137. In *Saturn Distrib. Corp.*, we distinguished the Virginia statute held to be preempted by the FAA from "the general rule of contract formation" at issue in *Supak*, and did not question *Supak*'s validity. 905 F.2d at 723. Moreover, even if there were tension between the two decisions, one panel of this court cannot overrule another panel. *See McMellon v. United States*, 387 F.3d 329, 334 (4th Cir. 2004) (en banc) ("[W]e conclude that when there is an irreconcilable conflict between opinions issued by three-judge panels of this court, the first case to decide the issue is the one that must be followed, unless and until it is overruled by this court sitting *en banc* or by the Supreme Court.").

*Supak* addressed the application of the same statute at issue here —
§ 25-2-207 — to a factual scenario indistinguishable from that pre-
sented by this case — an oral contract formed by merchants in the
textile industry that was followed by a written confirmation contain-
ing an arbitration clause. In *Supak*, we did not deem it necessary to
inquire into the particular facts of the case at hand in considering
whether the arbitration clause at issue represented a material alter-
ation. Because we interpreted *Frances Hosiery* as establishing a *per
se* rule, we simply applied that rule to the arbitration clause at issue.

I am unpersuaded that we can distinguish *Supak* by virtue of its
silence concerning whether arbitration is a usage of trade in the textile
industry. The majority opinion asserts that we need not follow *Supak*
because "usage of trade is a question of fact that must be proved by
the party asserting it," and *Supak*'s silence on the usage of trade issue
therefore "cannot be viewed as rejection of the contention that arbitra-
tion is a usage of trade in the textile industry." *Ante* at 11 n.4. The
issue, however, is not whether *Supak* rejected the idea that arbitration
could be a trade usage in the textile industry. The question is whether
*Supak* precludes us from conducting an inquiry into the facts of each
case to determine whether the arbitration clause at issue is a material
alteration, rather than simply applying *Frances Hosiery*'s *per se* rule.
*Compare N&D Fashions, Inc. v. DHJ Indust., Inc.*, 548 F.2d 722, 726
& n.7 (8th Cir. 1976) (stating that although cases such as *Frances
Hosiery* have held that an arbitration clause materially alters a con-
tract under UCC § 2-207, "the better reasoned position is that the
question whether an additional term in a written confirmation consti-
tutes a 'material alteration' is a question of fact to be resolved by the
circumstances of each particular case"). *Supak* did not attempt to limit
*Frances Hosiery* to its particular facts, but rather treated the decision
as establishing a *per se* rule. A *per se* rule applies "without reference
to additional facts." *See Black's Law Dictionary* (8th ed. 2004) (defin-
ing "per se" as "[o]f, in, or by itself; standing alone, without reference
to additional facts"). Accordingly, I read *Supak* differently than the
majority. I therefore believe that the district court did not err in apply-
ing *Frances Hosiery*'s *per se* rule rather than resolving the factual
question of whether Frontier had established a usage of trade.

## II.

I do not believe that we can distinguish *Supak* by asserting that
because arbitration is a trade usage in the textile industry, the portion

of the arbitration clause requiring the parties to submit their disputes to arbitration was not an "additional term" within the meaning of § 25-2-207(2) for two reasons. First, terms consistent with a trade usage may nevertheless constitute "additional terms" for purposes of § 25-2-207(2). Second, the existence of a trade usage is a question of fact that the district court has not resolved.

A.

Under § 25-2-207(2), "additional terms [in a written confirmation] are to be construed as proposals for addition to the contract." N.C. Gen. Stat. § 25-2-207(2). Between merchants, the additional terms become part of the contract unless "(a) the offer expressly limits acceptance to the terms of the offer; (b) they materially alter [the contract]; or (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received." § 25-2-207(2)(a)-(c).

The official comments to § 25-2-207 suggest that terms consistent with a trade usage may nevertheless be "additional" for purposes of § 25-2-207(2). Comment 5 lists examples of clauses that "involve no element of unreasonable surprise" and therefore should not be considered material alterations. Among these examples are "a clause providing for interest on overdue invoices or fixing the seller's standard credit terms *where they are within the range of trade practice* and do not limit any credit bargained for" and "a clause limiting the right of rejection for defects *which fall within the customary trade tolerances* for acceptance 'with adjustment' or otherwise limiting remedy in a reasonable manner." § 25-2-207 cmt. 5 (emphasis added). Thus, comment 5 suggests that the drafters of § 25-2-207(2) contemplated that terms consistent with trade usage might represent additional terms that would be screened for materiality. Moreover, comment 1 indicates that § 25-2-207 "is intended to deal with two typical situations," one of which "is where an agreement has been reached either orally or by informal correspondence between the parties and is followed by one or both of the parties sending formal memoranda embodying the terms so far as agreed upon and *adding terms not discussed*." § 25-2-207 cmt. 1 (emphasis added). Thus, comment 1 suggests that the terms that should be considered "additional" are those that the parties have not discussed.

At least two of our sister circuits, in interpreting other states' versions of U.C.C. § 2-207, have held that terms consistent with a trade usage or course of dealing may represent "additional terms" but do not materially alter a contract. In *Aceros Prefabricados, S.A. v. Trade-Arbed, Inc.*, 282 F.3d 92 (2d Cir. 2002), the Second Circuit noted that the official comments to New York's version of UCC § 2-207 "recognize the importance of trade practices to the material alteration analysis," because the examples of proposed terms that do not constitute material alterations contained in the comments include terms that are "within customary limits," or "within the range of trade practices," while "the common thread among the examples [of material alterations] provided is that they all constitute provisions that significantly deviate from industry norms." *Id.* at 101-02 (internal quotation marks and alteration omitted). There, the Second Circuit relied in part on "evidence that arbitration is standard practice in the steel industry" to conclude that an arbitration clause in a confirmation form was not a material alteration and therefore became part of the parties' contract. *Id.* at 102. Similarly, in *Schulze & Burch Biscuit Co. v. Tree Top, Inc.*, 831 F.2d 709 (7th Cir. 1987), the Seventh Circuit noted that Illinois's version of U.C.C. § 2-207 is followed by official comments suggesting that proposed terms consistent with trade practice or custom do not materially alter a contract. *Id.* at 714. In that case, Tree Top was seeking to enforce an arbitration clause contained in a written confirmation. The Seventh Circuit held that the arbitration clause did not constitute a material alteration of the parties' contract, because although Tree Top did not offer proof of a trade usage, it did prove a course of dealing between the parties that should have put Schulze on notice that the confirmation was likely to contain such a clause. *Id.* at 714-15.

In contrast, there is a dearth of precedent supporting the view adopted in the majority opinion. I am aware of no other case in which the reviewing court has fragmented an arbitration clause in order to treat the portion governing the obligation to arbitrate differently than the portion setting forth the terms and conditions under which arbitration would proceed. Notably, none of the cases cited by the majority in support of the proposition that arbitration is a trade usage have concluded that a trade usage cannot represent an additional term for purposes of U.C.C. § 2-207. To the contrary, those cases conform to the view that arbitration clauses contained in written confirmations of

oral agreements between merchants in the textile industry may represent additional terms, but do not materially alter a contract. *See, e.g.*, *Chelsea Square Textiles, Inc. v. Bombay Dyeing & Mfg. Co.*, 189 F.3d 289, 296-97 (2d Cir. 1999) (textile buyer was bound by an arbitration clause in a written confirmation because he failed to object to its addition to the contract).

To be sure, some commenters have described the official comments to U.C.C. § 2-207 as "poor from [an] analytical view," because "[i]f a term stated on a responsive document merely iterates what the law would otherwise impose, it is arguably not an 'additional' term." Duesenberg & King, *Sales and Bulk Transfers* § 3.03 (Bender's U.C.C. Service 2006) (stating that "[t]his would be true whether the term were implied by operation of a Code section, through custom and usage, prior course of dealing, or any other means by which a matter on which the parties are silent nonetheless becomes a part of their agreement"). Nevertheless, the official commentary to § 25-2-207 indicates that the statute's drafters meant the phrase "additional terms" to include all "terms not discussed" during the formation of an oral agreement, regardless of whether those terms in fact alter the agreement. Accordingly, I would follow the reasoning of our sister circuits to conclude that terms consistent with a trade usage may constitute "additional terms" within the meaning of § 25-2-207(2), but generally do not materially alter a contract.

B.

Even assuming that we could conclude that terms in keeping with a trade usage are not "additional terms" for purposes of § 25-2-207(2), I believe that it would be inappropriate for us to hold that arbitration is a trade usage in the textile industry when the district court has not ruled on this factual issue. *See* N.C. Gen. Stat. Ann. § 25-1-205(2) (2006) (stating that the existence and scope of a trade usage "are to be proved as facts" and if it "is established that such a usage is embodied in a written trade code or similar writing, the interpretation of the writing is a question for the court"). To be sure, the "Yarn Rules" and a number of cases indicate that, in general, arbitration is commonly used in the textile industry. In North Carolina, however, *Frances Hosiery* has been the law for over thirty years. Thus, it seems that the relevant trade usage in North Carolina could well be that par-

ties enter into arbitration agreements by signing and returning written confirmations. Many of the plaintiffs in this case assented to Frontier's arbitration agreements in precisely that manner. Also, the "Yarn Rules" suggest that merchants in the textile industry should expect to be bound by arbitration clauses contained in confirmation forms, but might not necessarily expect to be bound to arbitrate in the absence of such a writing. (*See* J.A. at 542-53 (excerpt from the "Yarn Rules" stating that "[p]arties to the sale and purchase of yarns are members of the textile industry, which has, for over, fifty years, settled disputes by arbitration *in accordance with the terms and conditions of contracts which have tended to become standard . . .*" (emphasis added)).) Because the district court has not addressed this issue, we should not take it upon ourselves to find that "Frontier has met its burden of proving that arbitration is a usage of trade . . . ." *Ante* at 9. Rather, we should allow the district court to make findings of fact on remand.

C.

Finally, another issue prevents us from resolving this case by relying on the UCC's "gap-filler" provision, codified in North Carolina as N.C. Gen. Stat. Ann. § 25-1-201 (2006). One might argue that after concluding that, under *Supak*, the arbitration clauses contained in the written confirmations constituted material alterations that did not become part of the parties' agreement, the district court should have turned to § 25-1-201 to fill the gap left by the oral contract's silence on the question of arbitration. *See* N.C. Gen. Stat. Ann. § 25-1-201(b)(3) (2006) (defining an "agreement" as "the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade").

Resolving this question after determining that the arbitration clauses in the written confirmations did not become part of the contracts, however, would be purely an academic exercise. The issue before this court is whether the district court erred in denying Frontier's motion to compel arbitration. To compel arbitration under the Federal Arbitration Act (FAA), a litigant must demonstrate, *inter alia*, "a *written* agreement that includes an arbitration provision which purports to cover the dispute." *Adkins v. Labor Ready, Inc.*, 303 F.3d

496, 500-01 (4th Cir. 2002) (emphasis added) (internal quotation marks omitted). Thus, Frontier cannot compel arbitration based on an implied term in an oral contract. It must proffer a *written* agreement containing an arbitration clause that purports to cover its dispute with the plaintiffs. The writings that Frontier provided to satisfy this requirement were the confirmations that it sent to the plaintiffs. Accordingly, Frontier's ability to compel arbitration depends on whether or not the arbitration clauses in the written confirmations became part of its contracts with the plaintiffs.

### III.

In sum, I fully concur in Part II of the majority opinion. I therefore concur in the judgment only with regard to those plaintiffs that either signed and returned Frontier's confirmation forms or had contracts governed by South Carolina law. I respectfully dissent from Part I, however, because I believe that this case is controlled by our decision in *Supak*. Accordingly, I would hold that because the North Carolina arbitration agreements in Frontier's confirmation forms did not become part of the contracts with those plaintiffs that did not sign and return the forms, the district court did not err in denying Frontier's motion to compel arbitration as to those plaintiffs.

JOHNSTON, District Judge, concurring in part and dissenting in part:

I concur in Part I, Part II(A), and Part II(B)(1) of the majority opinion. I respectfully dissent, however, from Part II(B)(2), Part II(B)(3), and the result that this case should be remanded for further proceedings in the district court, as described in the majority opinion.

### I.

The majority opinion acknowledges that federal statutory claims are subject to arbitration if the litigants can effectively vindicate their substantive statutory claims in the arbitral forum. The majority concludes that the Antitrust Act's four-year limitations period, 15 U.S.C. § 15b, is not a "substantive right" and that the arbitration clause's limitation of this period to one year does not, *per se*, prevent the plaintiffs from "effectively vindicating their statutory rights."[1] The

---

[1] Parts II(B)(2) & (3) of the majority opinion. In Part II(B)(1) of the opinion, the majority concludes that the one year limitation period is not unreasonably short.

majority then directs the district court, on remand, to examine whether the plaintiff's claims are *entirely* barred by operation of the one year limitations provision, taking into account the doctrine of fraudulent concealment. If the plaintiffs' claims are entirely barred, then the district must consider severance of the limitations provision, in addition to invalidation of the arbitration agreement.

I respectfully disagree with Part II(B)(2) and Part II(B)(3) of the opinion and the majority's directions to the district court upon remand. I would hold that the four-year limitations period contained in 15 U.S.C. § 15b is a non-waivable substantive right, and that the purported waiver of this right would, in this case, prevent the plaintiffs from effectively vindicating their statutory rights. I would further conclude that severance of this provision is the appropriate remedy, and remand the case to the district court to order that the case proceed to arbitration.

## II.

The plaintiffs allege that the defendants engaged in a price fixing conspiracy from the beginning of 1999 through February of 2004, when the plaintiffs first became aware of the alleged anti-competitive activity. Based on these allegations, the plaintiffs brought Sherman Act claims against the defendants in 2004.[2]

The Sherman Act, 15 U.S.C. § 1, *et seq.*, embodies an important, and now time-tested, public policy to prohibit market conduct which unfairly or unduly restrains competition. As Justice Black wrote more than half a century after its passage:

> The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment

---

[2]As noted in the majority opinion, various plaintiffs filed actions in March, April, May, and August of 2004.

conducive to the preservation of our democratic political and social institutions.

*N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). More recently, Justice Stevens has stated:

> The Sherman Act reflects a legislative judgment that ultimately competition will produce not only lower prices, but also better goods and services. . . . The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers.

*Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 695 (1978).

"Ordinarily, a cause of action accrues under the antitrust laws when the plaintiff suffers an injury to his business." *Sanderson v. Spectrum Labs, Inc.*, 227 F. Supp. 2d 1001, 1011 (N.D. Ind. 2000) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). Generally, there is a four-year limitations period for Sherman Act claims. 15 U.S.C. § 15b. The arbitration agreements in this case provide that any claim must be brought within one year "after the claimed breach occurs" and "[t]he failure to institute arbitration proceedings within this one year period shall constitute an absolute bar to [those claims.]"

Application of the one year claims limitation period has two related effects: (1) limiting the defendants' exposure for any antitrust claim to one year from the date of the alleged anti-competitive behavior, and (2) limiting the plaintiffs' possible recovery to a one year period. Thus, while the Antitrust Act effectively requires a four year lookback period, the contract at issue would only allow the arbitrator to consider one year of anti-competitive behavior. The plaintiffs assert that they would be deprived of a substantive right under the statute — the right to recover damages for three out of the four years of alleged anti-competitive activity.

III.

Generally, arbitration agreements are enforceable "so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, [and] the statute will continue to serve both its remedial and deterrent function." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637. In other words, an arbitration agreement cannot operate to waive substantive rights provided by statute. *Id.* at 628 ("By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum."). In this respect, "the arbitrability of [federal statutory claims] rests on the assumption that the arbitration clause permits relief equivalent to court remedies." *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998). Although the Supreme Court has never ruled directly on whether an arbitration clause that does not permit relief equivalent to court remedies might nevertheless be enforceable, it has indicated a willingness to strike down arbitration agreements that have the effect of depriving litigants of remedies prescribed by the antitrust statutes. In *Mitsubishi*, the Court noted that in the event that an arbitration agreement's choice-of-forum and choice-of-law provisions operated, in effect, as "a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, [the Court] would have little hesitation in condemning the agreement as against public policy." *Id.* at 637 n.19.

Applying these principles, our sister circuits have consistently invalidated arbitration agreements that proscribe the arbitral award of damages guaranteed by statute. *See, e.g.*, *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 & n.14 (5th Cir. 2003) (noting that an arbitration clause that bans punitive damages is unenforceable in the context of a Title VII claim because Title VII provides for statutory punitive damages); *Paladino*, 134 F.3d at 1062 (11th Cir. 1998) (holding an arbitration agreement unenforceable because it proscribed an arbitral award of Title VII damages). The First Circuit recently relied on *Mitsubishi*'s condemnation of arbitration agreements that effect a prospective waiver of plaintiff's right to pursue statutory remedies, as well as the mandatory language in the Clayton Act provision providing for treble damages, 15 U.S.C. § 15(a), to conclude that "the award of treble damages under the federal antitrust statutes cannot be waived." *Kris-*

*tian v. Comcast Corp.*, 446 F.3d 25, 48 (1st Cir. 2006) (holding invalid an arbitration clause that purported to waive the availability of treble damages under the federal antitrust statutes).[3] The issue in this case differs somewhat from that confronted by the *Kristian* court in that enforcement of the arbitration agreement's limitations provision would not proscribe the award of a particular *type* of damages, but it would instead affect the *amount* of the award. The practical effect of the provision, however, is the same. If the contractual limitations provision is enforced, the plaintiffs will not be permitted to recover treble damages for the injury sustained over the course of the statutory four-year period. *See* 15 U.S.C. § 15(a) (providing that a party "shall recover threefold the damages by him sustained").

I would hold that the enforcement of the arbitration clause, which facially operates to strip the plaintiffs of seventy-five percent of the damages to which they would otherwise be entitled under the antitrust statutes, would defeat the statute's remedial and deterrent purposes. *Paladino*, 134 F.3d at 1062 ("When an arbitration clause has provisions that defeat the remedial purpose of the statute, . . . the arbitration clause is not enforceable.") The dramatic reduction in damages would likely fall short of fully compensating the plaintiffs and allow the defendants the benefit of at least a portion of their alleged illegal activity.[4]

---

[3]In *Kristian v. Comcast Corp.*, 446 F.3d 25 (1st Cir. 2006), the plaintiffs argued that a one-year limitations provision in an arbitration clause was invalid as applied to their antitrust claims "on the basis of [the] direct conflict" between the contractual provision and the four year limitations period provided by the Clayton Act. *Id.* at 43. The First Circuit concluded that, under its precedent, a dispute over a statute of limitations was "the sort of procedural prerequisite that is presumed to be for the arbitrator," not the court. *Id.* (internal quotation marks omitted). In the case before us, the specific language of the arbitration agreements provides that a court, not an arbitrator, must decide statute of limitations issues. The agreements provide that "'[a]ll issues relating to Statute of Limitations barring or preventing the commencement of proceedings are not arbitrable and shall be determined by the Court and not the arbitrators who shall have no power or jurisdiction to determine such issues.'" *In re Cotton Yarn Antitrust Litig.*, 406 F. Supp. 2d 585, 603 (M.D.N.C. 2005).

[4]I decline to address whether the doctrine of fraudulent concealment would have any effect on my analysis of this issue because the parties arguably did not raise this issue, it has certainly not been developed by the parties in this appeal, and it was not considered at the district court level.

## IV.

As noted in the majority opinion, the court must consider two remedies after finding an unenforceable term in an arbitration agreement: severance of the offending term and invalidation of the entire arbitration agreement. The limitations period, while of great importance to the defendants, is but one part of the arbitration agreement; it cannot be viewed as integral to or the primary object of the arbitration agreement. In my view then, the court should sever the offending limitations provisions from the otherwise enforceable arbitration agreements. *See Hadnot*, 344 F.3d at 478 ("The purpose of the arbitration provision is to settle any and all disputes arising out of the employment relationship in an arbitral forum rather than a court of law. Even with its unlawful limitation on the types or permissible damage awards lifted, so that the decision maker is free to address punitive damages, the arbitration clause remains capable of achieving this goal. In fact, the lifting of that illegal restriction enhances the ability of the arbitration provision to function fully and adequately under the law."). I believe that the limitations provisions can and should be severed from the arbitration agreements, and the case should be remanded to the district court with directions to send it to arbitration. Immediate severance of this single provision of the overall arbitration agreement is a purely legal matter which will allow the parties to avoid further time and resource-intensive litigation of these threshold matters, and allow them to move toward a resolution of the substantive issues of these cases.

I therefore respectfully dissent from Parts II(B)(2) and II(B)(3) of the majority opinion.