**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1094

NATALIE THOMAS,

Plaintiff – Appellant,

v.

EOTECH, LLC,

Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Theodore D. Chuang, District Judge. (8:23-cv-03313-TDC)

Argued:  October 21, 2025                    Decided:  March 4, 2026

Before HARRIS, HEYTENS, and BENJAMIN, Circuit Judges.

Affirmed in part and vacated in part by published opinion. Judge Heytens wrote the opinion, which Judge Harris and Judge Benjamin joined.

**ARGUED:** Jordan Daniel Santo, KOLLER LAW LLC, Philadelphia, Pennsylvania, for Appellant. Donovan Solanus Asmar, BODMAN PLC, Troy, Michigan, for Appellee. **ON BRIEF:** Scott M. Pollins, POLLINS LAW, Wayne, Pennsylvania, for Appellant. Stephen P. Dunn, BODMAN PLC, Detroit, Michigan; Craig D. Roswell, NILES, BARTON & WILMER, LLP, Baltimore, Maryland, for Appellee.

TOBY HEYTENS, Circuit Judge:

May private parties prospectively shorten the time Congress gave employees to sue their employers under Title VII of the Civil Rights Act of 1964 or the Age Discrimination in Employment Act (ADEA)? Joining the Sixth Circuit, we hold the answer is no because judicial enforcement of such agreements would disrupt the relevant statutes' carefully integrated and uniform remedial schemes. We thus vacate the district court's grant of summary judgment in relevant part and remand for further proceedings.

I.

Plaintiff Natalie Thomas used to work for defendant EOTech, LLC. Before starting her job, Thomas signed an EOTech-drafted document that included language purporting to shorten the time she would otherwise have to sue EOTech for any disputes "relating to [her] employment." JA 24. The relevant paragraph—which we, like the district court, will call the Limitations Agreement—reads as follows:

> As a condition of employment or continued employment, unless otherwise provided for by law, I agree not to file any action or suit relating to my employment more than 180 calendar days after the event and/or employment practice or action complained of including, but not limited to, employment termination and discrimination claims, claims for wages, salary, commissions, or expenses, and to waive any state or federal statutes of limitation to the contrary. I understand that the statute of limitations for claims arising out of an employment action may be longer than 180 calendar days, and agree that any employer action that is the subject of a lawsuit or action is barred if it is not filed within the 180 day period unless otherwise provided for by law. This provision does not prohibit the timely filing of a charge with a federal administrative agency under federal law, but unless filed within 180 days (or in less time if any applicable law requires), I waive the right to recover money damages or other relief. I further agree that if I am required to file a charge or claim with an administrative [agency] before I can file any action or suit and/or if I need authorization from an administrative agency such as a right to sue letter, unless otherwise provided

2

for by applicable law, the 180 day period is tolled during the time the charge or claim is pending before that administrative agency. The period before and after the filing of a charge or claim will count toward the 180-day period.

JA 24–25.

On November 9, 2022, EOTech fired Thomas. On February 23, 2023, Thomas filed a charge of discrimination with both the Equal Employment Opportunity Commission and the Maryland Commission on Civil Rights. On September 7, 2023, the EEOC sent Thomas a right-to-sue letter. On December 6, 2023, Thomas sued EOTech in federal district court, alleging (as relevant here) violations of Title VII, the ADEA, and the Maryland Fair Employment Practice Act (MFEPA).

EOTech moved to dismiss the complaint, asserting it was untimely under the Limitations Agreement because 196 countable days had elapsed (106 days from termination to filing an EEOC charge plus an additional 90 days after receiving notice from the EEOC). With the parties' consent, the district court converted EOTech's motion to one for summary judgment because the document containing the Limitations Agreement was neither attached to Thomas's complaint nor incorporated by reference. The district court then granted summary judgment to EOTech on all claims, concluding that the parties— through the Limitations Agreement—had validly shortened Thomas's timeframe to sue and that the complaint was thus untimely.

II.

As always, "[w]e review the district court's ruling on summary judgment de novo, applying the same legal standards as the district court." *Edwards v. CSX Transp., Inc.*, 150 F.4th 232, 235 (4th Cir. 2025). Summary judgment is appropriate if "there is no

3

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, there are no disputed material facts: Everyone agrees that Thomas's claims are untimely if the Limitations Agreement governs and timely if it does not. The questions before us are thus legal ones. First, under federal law, did the Limitations Agreement validly shorten the time Thomas had to bring her Title VII or ADEA claims? Second, under Maryland law, did the Limitations Agreement validly shorten the time Thomas had to bring her MFEPA claims?

### III.

We hold that parties may not prospectively render untimely a lawsuit that would otherwise be timely under Title VII or the ADEA. See *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 839 (6th Cir. 2019) (Title VII); *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 520–21 (6th Cir. 2021) (ADEA). We thus vacate the district court's grant of summary judgment to EOTech on those claims.

### A.

A person who believes her employer (or prospective or former employer) has violated Title VII or the ADEA may not simply go down to the courthouse and file a lawsuit. Instead, Congress has created for both statutes an intricate remedial scheme that requires an employee to first seek assistance from government agencies and grants those agencies considerable power over when (and even if) the employee may bring her own suit.

Start with Title VII, which prohibits employment discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under that statute, an

4

employee who believes her rights have been violated may not sue without first filing a "charge" with the EEOC. *EEOC v. Commercial Off. Prods. Co.*, 486 U.S. 107, 110 (1988); see 42 U.S.C. § 2000e-5(e)(1). The statute provides detailed rules for calculating how much time an employee has to file such a charge, and the period can range from 180 to 300 days after the allegedly unlawful employment practice. See 42 U.S.C. § 2000e-5(e)(1); see also *Logan*, 939 F.3d at 827–28 (describing factors that impact how long a person has to file a charge with the EEOC).

Once the EEOC receives a charge, it must "serve a notice of the charge (including the date, place[,] and circumstances of the allegedly unlawful employment practice)" on the employer and "make an investigation thereof." 42 U.S.C. § 2000e-5(b). If the EEOC "determines after such investigation that there is not reasonable cause to believe that the charge is true," it must "dismiss the charge and promptly notify" both the complaining party and the employer. *Id.* But even if the EEOC concludes "that there is reasonable cause to believe that the charge is true," neither it nor the employee may simply file suit at that point. *Id.* Instead, the EEOC "shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." *Id.*

Even when a lawsuit proves unavoidable, Title VII contains interlocking rules about who may file a lawsuit and when. To start, if the EEOC concludes there is reasonable cause to believe the employer violated the statute but is "unable to secure" an acceptable conciliation agreement, the agency may bring its own "civil action." 42 U.S.C. § 2000e-5(f)(1). In that situation, the employee cannot bring her own suit but "shall have the right to intervene" in the EEOC's suit. *Id.* The statute provides "no limitation on the

5

time during which an EEOC enforcement suit may be brought." *Occidental Life Ins. Co. of Cal. v. EEOC*, 432 U.S. 355, 366–67 (1977); see *id.* at 372–73.

In contrast, Title VII contains additional timing rules for private suits. The default rule is that an employee must wait until the EEOC "notif[ies]" her that it has not found reasonable cause to support her allegations or that it will not bring its own suit. 42 U.S.C. § 2000e-5(f)(1). The employee may also "request[], in writing, that a notice of right to sue be issued." 29 C.F.R. § 1601.28(a)(1); see 42 U.S.C. § 2000e-5(f)(1). Either way, the statute provides that a private "civil action may be brought" only "within ninety days after the giving of such notice." 42 U.S.C. § 2000e-5(f)(1).

The ADEA's enforcement provisions are simpler but similar. See 29 U.S.C. §§ 626(d)(1), (e); see also George Rutherglen, *Title VII as Precedent: Past and Prologue for Future Legislation*, 10 Stan. J. C.R. & C.L. 159, 167 (2014) (explaining that Congress used Title VII as a model for the ADEA's language and enforcement framework). The ADEA states that "[n]o civil action may be commenced by an individual . . . until 60 days after a charge alleging unlawful discrimination has been filed with" the EEOC, while creating the same floating 180- to 300-day charge-filing deadline as Title VII. 29 U.S.C. § 626(d)(1). As with Title VII, the EEOC must notify the employer and "promptly seek to eliminate any allegedly unlawful practice by informal methods of conciliation, conference, and persuasion." § 626(d)(2). And, as with Title VII, an employee may not bring a private suit under the ADEA if the EEOC chooses to sue on her behalf, see § 626(d)(1), and must file any private suit within 90 days of receiving notice that the EEOC has dismissed or terminated its investigation, see § 626(e).

The timing rules described above strike a "delicate balance" between competing goals. *Logan*, 939 F.3d at 829. Like all limitation periods, they reflect Congress's weighing of various interests—most obviously, society's interest in deterring and remedying unlawful discrimination versus employers' interest in not having to defend against (or remain prepared to defend against) stale claims. But Title VII and the ADEA's unusually complicated procedural and timing rules balance other interests too. Requiring aggrieved employees to seek redress from the EEOC before filing suit reflects Congress's decision to "rel[y] on a combination of public and private" enforcement. *Id.* at 827. Giving employees more time to file an EEOC charge if they first seek relief from "a State or local agency with authority to grant or seek relief from such practice," 42 U.S.C. § 2000e-5(e)(1) (Title VII); see 29 U.S.C. § 626(d)(1) (ADEA), honors cooperative federalism principles. Creating *separate* periods for how long an employee has to file a charge with the EEOC and how long she then has to sue if the EEOC declines to take action reduces any incentive aggrieved employees may otherwise have to give "short shrift" to either pre-charge or "pre-suit investigation." *Logan*, 939 F.3d at 829. And having Title VII and the ADEA specify their own limitations periods rather than incorporate or borrow them from state law underscores Congress's choice to favor a "uniform" and "nationwide" enforcement system. *Id.* at 832.

## B.

We agree with the Sixth Circuit that allowing private parties to prospectively shorten the time an employee has to bring suit under Title VII or the ADEA would "abrogate[] substantive rights and contravene[] Congress's uniform nationwide legal

7

regime for Title VII" and ADEA lawsuits. *Logan*, 939 F.3d at 826; accord *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 51 (1974) ("[T]here can be no prospective waiver of an employee's rights under Title VII."); 29 U.S.C. § 626(f)(1)(C) (same for the ADEA).

The inevitable—indeed, the only—impact of the Limitations Agreement is to shorten the total time Thomas would have to complete two tasks: file a charge with the EEOC and, after the EEOC proceedings conclude, file a private lawsuit. To be sure, this Limitations Agreement—unlike the agreement the Sixth Circuit considered in *Logan*, see 939 F.3d at 826—states that its 180-day period "is tolled during the time [a] charge or claim is pending" before the EEOC. JA 25. But that still means the Limitations Agreement gave Thomas just 180 days to do two things (file a charge and then a lawsuit) that both Title VII and the ADEA would otherwise have given her at least 270 days to do. See Part III(A), *supra* (explaining why, under the statutes, employees would always have at least 180 days to file a charge with the EEOC followed by 90 days to file suit after hearing back). Put another way, the Limitations Agreement cannot function without reducing *either*: (1) the time Thomas had to file a charge with the EEOC; or (2) the time she had to sue after the EEOC proceedings terminated. We conclude either outcome would do violence to the carefully integrated remedial schemes Congress enacted.

Start with shortening the time an employee has to file a charge with the EEOC. Both Title VII and the ADEA create "remedial scheme[s] in which laypersons, rather than lawyers, are expected to initiate the process." *Commercial Off. Prods.*, 486 U.S. at 124. Indeed, "*pro se* filings may be the rule, not the exception," at the charge-filing stage. *Federal Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008). For that reason, the Supreme

8

Court has emphasized that the process for filing EEOC charges "must be accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes." *Id.* at 403.

Now imagine an employee who signed—probably as part of a mountain of onboarding paperwork—an agreement that purports to give her only 180 days both to file a charge with the EEOC and then, if necessary, a lawsuit. Years later, the employer does something the employee believes may have been illegal. The employee has no lawyer and must try to figure out what, if any, recourse she has. See *Federal Exp. Corp.*, 552 U.S. at 400 (describing the EEOC's dual role of "enforcing antidiscrimination laws and disseminating information about those laws to the public"). Publicly available information, like the relevant statutory provisions and the EEOC's website, explains that employees like her may "file a charge [with the EEOC] within 180 calendar days from the day the discrimination took place," but that the deadline is, in certain circumstances, "extended to 300 calendar days." *Time Limits For Filing a Charge*, U.S. EEOC, https://www.eeoc.gov/time-limits-filing-charge [https://perma.cc/MUR3-2FVH].

Permitting judicial enforcement of contracts like the Limitations Agreement would seriously impair the navigability of this system. As the EEOC's website advises, it can *already* be "complicated" for employees to "[f]igur[e] out how much time" they have "to file a charge" because "[h]olidays and weekends are included in the calculation." *Time Limits For Filing a Charge*, U.S. EEOC, *supra*. But matters will get far worse if *pro se* employees are expected to remember whether they ever signed a document purporting to limit how long they had to file a charge with the EEOC, locate the relevant document, and

9

figure out for themselves whether (and if so how) that document does or does not modify what federal statutes and the EEOC's own website say.

So now consider the effect of allowing judicial enforcement of private contracts that shorten the time an employee has to file suit after hearing back from the EEOC. At oral argument, EOTech insisted there is no problem here, because employees like Thomas can (and probably should) just hire lawyers to prepare lawsuits while their charges are still pending before the EEOC. See Oral Arg. 29:00–:40. That argument cannot be squared with the remedial schemes Congress enacted.

The whole point of requiring employees who believe they have been unlawfully discriminated against to file a charge with the EEOC is to avoid private lawsuits if possible. Maybe the EEOC process will help the employee realize that what the employer did was not illegal or that she does not want to pursue the matter further. Maybe the conciliation process will work, and the employee will be satisfied with the outcome. Or maybe the EEOC will file suit, thus obviating the employee's need to file one of her own. Telling employees that they should hire private lawyers and get their lawsuits ready before the EEOC concludes its own process cannot be squared with Congress's choice to make "cooperation and voluntary compliance . . . the preferred means for achieving the goal of equality of employment opportunities." *Occidental Life Ins.*, 432 U.S. at 367–68 (alterations and quotation marks removed); see *Alexander*, 415 U.S. at 44 (stating that Title VII's enforcement scheme is designed to give the EEOC and similar state agencies "an opportunity to settle disputes through conference, conciliation, and persuasion *before* the aggrieved party [is] permitted to file a lawsuit" (emphasis added)).

10

Consider too the plight of an employee who gets a right-to-sue letter from the EEOC. Consistent with the United States Code, the Code of Federal Regulations, and the EEOC's website, the letter tells the employee she has 90 days to sue her employer. But if EOTech's position were correct, that may not actually be true. And even if the employee has found a lawyer by that point, the lawyer will need to ask the employee for copies of every agreement she has ever signed with her employer and calculate how much time the employee *actually* has left. We see no evidence Congress meant for employees (or their lawyers) to have to navigate such complexities just to file a lawsuit in the first place.

Enforcing contracts like the Limitations Agreement also risks distorting the EEOC's decisions. Imagine two employees—Ann and Bill—who both file timely EEOC charges. The EEOC investigates and determines both charges have merit, but it only has the capacity to pursue one of them. All else equal, the EEOC would sue in Ann's case while leaving Bill to file his own suit. (Perhaps the facts of Ann's case are more egregious, or the agency hopes to use her case to establish a broader legal principle.) But what if the EEOC knows it might be difficult—if not impossible—for Bill to file a private suit because he signed an agreement that has left him with little (if any) time to file one? Would the agency feel compelled to choose Bill's case over Ann's? Here too, we see no evidence Congress meant for the EEOC to have to weigh such tradeoffs.

C.

For its part, EOTech insists this Court has already essentially decided this case in its favor. As support, it relies primarily on the Court's (admittedly broad) statement in *In re Cotton Yarn Antitrust Litigation*, 505 F.3d 274 (4th Cir. 2007), that "[a]s a general rule,

11

statutory limitations periods may be shortened by agreement so long as the limitations period is not unreasonably short." *Id.* at 287. According to EOTech, that general rule governs here and the Limitations Agreement is enforceable because its single 180-day time limit is not unreasonably short. But *Cotton Yarn* involved a very different issue than the one we face here, and we conclude its holding does not apply in this situation.

The question in *Cotton Yarn* was whether a district court erred in not dismissing certain Sherman Act claims because the plaintiffs who brought them had validly agreed to arbitrate any such disputes. See 505 F.3d at 277. The Court first concluded that, under North Carolina law, the parties made contracts that included arbitration clauses. See *id.* at 278–81. The Court next turned to "the broader question of whether the arbitration agreements [were] enforceable," *id.* at 281, and it rejected two arguments for why they were not, see *id.* at 281–93. One of those arguments was that the arbitration clauses were unenforceable because they purported to give the parties one year to initiate arbitration of claims about which they would otherwise have four years to sue in court. See *id.* at 287. So *Cotton Yarn*'s relevant holding is that—at least as a general matter—a provision in an arbitration clause that gives private parties less time to initiate arbitration than they would otherwise have had to file suit does not render the arbitration clause unenforceable or excuse courts from enforcing it. Accord *Bracey v. Lancaster Foods, LLC*, 838 Fed. Appx. 745, 746 (4th Cir. 2020) (rejecting the argument that an agreement requiring arbitration of certain employment related claims was "unconscionable" because it gave a party less time to initiate arbitration than that party would otherwise have had to bring suit).

This situation is far different. This case involves no agreement to arbitrate and thus

12

does not implicate the "liberal federal policy favoring arbitration agreements" that is embodied in the Federal Arbitration Act (FAA) and framed the Court's entire analysis in *Cotton Yarn*. 505 F.3d at 281–82 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and discussing that policy in detail). The FAA requires courts to enforce most private arbitration agreements, see 9 U.S.C. §§ 2–4, and *Cotton Yarn* holds that the fact that an agreement contains time limits for seeking arbitration does not eliminate that obligation. But *Cotton Yarn* had no occasion to consider whether—and if so when—private parties may by contract create a new affirmative defense to an otherwise timely filed federal statutory claim.

EOTech also cites *Atlantic Coast Line Railroad Co. v. Pope*, 119 F.2d 39 (4th Cir. 1941), but that decision is even further afield. That case arose out of a dispute between a railroad and its employees. See *id.* at 40. The Railway Labor Act governs such controversies and creates a system very different from Title VII and the ADEA. See *id.* at 41. The Railway Labor Act's "purpose was to continue the local settlement of disputes, in accordance with the established practice, if a carrier and its employees, acting through their representatives, should so elect." *Id.* at 43. In other words, that Act empowered rail carriers and their employees' unions to establish the terms governing resolution of any disputes, including the ability to select a "shorter" period for bringing claims than the one "set up in the statutes of limitations" that would apply absent such an agreement. *Id.* at 44. But the reason it was "within the power of the parties" to do so in *Atlantic Coast Line Railroad* (*id.*) was because Congress so instructed in the Railway Labor Act. Here, in contrast, neither Title VII nor the ADEA contains any such statement, and both statutes contemplate

13

a uniform enforcement system.

To be sure, *Cotton Yarn* (and to a lesser extent, *Atlantic Coast Line Railroad*) contains broad language about parties' ability to "shorten[]" "statutory limitations periods." 505 F.3d at 288. But we have it on good authority that "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.). We thus read those decisions' "general language" as courts "often read general language in judicial opinions—as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Illinois v. Lidster*, 540 U.S. 419, 424 (2004).

Our own holding is similarly limited. We need not—and thus do not—decide whether (and if so, when) private parties may ever prospectively shorten by contract the statutory period for suing on a federal statutory claim. Instead, we hold only that the district court erred in dismissing Thomas's suit because parties may not by advance agreement render untimely a suit that would otherwise be timely under Title VII or the ADEA. Cf. *Felder v. Casey*, 487 U.S. 131, 134 (1988) (holding that state law may not impose additional requirements for suing under 42 U.S.C. § 1983).*

---

* Even if what EOTech claims was *Cotton Yarn*'s general rule applied here, we would conclude this case implicates both exceptions recognized in that opinion. *First*, although neither Title VII nor the ADEA expressly prohibits private parties from prospectively modifying their various timing provisions, courts read statutes as a whole rather than individual provisions in isolation. See, *e.g.*, *Samantar v. Yousuf*, 560 U.S. 305, 319 (2010). And just like federal statutes may preempt state laws without an express preemption clause, see, *e.g.*, *Arizona v. United States*, 567 U.S. 387, 399–400 (2012), we (Continued)

14

IV.

That leaves Thomas's MFEPA claims. Even in federal court, state law governs how long a plaintiff has to bring a state-law claim. See, *e.g.*, *Guaranty Tr. Co. of N.Y. v. York*, 326 U.S. 99, 110 (1945). And under Maryland law, "[p]arties may agree to a provision that modifies the limitations result that would otherwise pertain provided (1) there is no controlling statute to the contrary, (2) it is reasonable, and (3) it is not subject to other defenses such as fraud, duress, or misrepresentation." *Ceccone v. Carroll Home Servs.*, 165 A.3d 475, 482–83 (Md. 2017) (quotation marks removed). Guided by those standards, we conclude the district court did not err in determining the parties validly limited the amount of time Thomas had to bring her MFEPA claims.

Thomas makes no argument that there is a "controlling statute" to the contrary or that the Limitations Agreement is "subject to other defenses such as fraud, duress, or misrepresentation." *Ceccone*, 165 A.3d at 483 (quotation marks removed). Instead, she argues only that the time provided for bringing suit "is unreasonably short," Thomas Br.

---

conclude that Title VII and the ADEA are best interpreted as forbidding such a result. See *Cotton Yarn*, 505 F.3d at 287 (considering whether the federal statute at issue was best read to "prevent parties from agreeing contractually to a shortened limitations provision"). *Second*, and for similar reasons, we conclude that enforcing the Limitations Agreement would impair "substantive rights" because here—unlike in *Cotton Yarn*—the relevant time limits were enacted as part of the original statues and are inextricably bound up with the rights and remedies Congress created. See *id.* at 289 (emphasizing that the relevant limitations period was enacted "more than forty years after the original substantive liabilities were established" (quotation marks removed)); accord *Davis v. Mill*, 194 U.S. 451, 454 (1904) (Holmes, J.) (distinguishing between situations "where a statute creates a new liability, and in the same section or in the same act limits the time within which it can be enforced" and those where the liability creating and time limiting provisions were enacted separately).

15

18, which would violate *Ceccone*'s second requirement. Based on the arguments Thomas has properly raised, we disagree.

Under *Ceccone*, courts assess reasonableness under "the totality of the circumstances." 165 A.3d at 485. But even though Maryland's highest court has identified five nonexclusive factors for courts to apply in making that determination, see *id.*, Thomas's brief neither references those factors nor makes any argument about why they cut in her favor. Because no such arguments have been preserved for our review, see, *e.g.*, *Grayson O Co. v. Agadir Int'l LLC*, 856 F.2d 307, 316 (4th Cir. 2017), we conclude the district court committed no reversible error in dismissing Thomas's MFEPA claims. In so doing, we make no ruling about whether someone in Thomas's position *could have* made a winning argument under *Ceccone*'s second factor. See, *e.g.*, *Ceccone*, 165 A.3d at 485 (instructing courts to consider "the relative bargaining power of the parties" and "whether the shortened limitations period applies only to claims brought by one of the parties or runs in both directions").

*    *    *

Because Thomas's Title VII and ADEA claims were timely, we vacate the grant of summary judgment to EOTech on those claims. But the district court made no reversible error in concluding that Thomas's MFEPA claims were time barred. The judgment is thus affirmed in part and vacated in part, and the case is remanded for further proceedings consistent with this opinion.

*SO ORDERED*

16